## UNITED STATES v. CANADA.
### Cr. No. 457.

United States District Court
**D.** Nebraska, Grand Island Division.
April 11, 1951.

.Edward J. Tangney, Asst. U. S. Atty., Omaha, Neb., for plaintiff.

Archie W. Storms, Holdrege, Neb., for defendant.

DELEHANT, District Judge.

The defendant was charged, in an information containing twenty counts, with as many several operations each involving the interstate transportation for hire of a quantity of a designated petroleum product as a common carrier, without first obtaining an appropriate certificate of convenience and necessity. Title 49 U.S.C.A. §§ 306(a) and 322(a). He pleaded not guilty and waived trial by jury. Trial has been had to the court and the ruling and judgment of the court are now announced. The facts, most of which are not in dispute, are first recalled and found.

The interval within which the challenged cargo movements occurred was from November 5, 1948 to March 29, 1949. During that period, and for several years theretofore, the defendant, a resident of Bertrand, Nebraska, was engaged in business as a common carrier for compensation by motor vehicle of petroleum products in bulk on public highways and held an Interstate Commerce Commission permit or certificate of public convenience and necessity for such transportation over irregular routes from refining and distributing points in Kansas to a large number of designated points, not including Kearney or Lowell, in Nebraska.

Prior to March, 1947, and continuously thereafter through the interval mentioned in the previous paragraph, H. V. Grantham & Sons, a co-partnership, of Kearney, Nebraska (hereinafter referred to as Grantham) was the owner of Interstate Commerce Commission permit or certificate of convenience and necessity, No. MC.850 (with supplemental and corrective certificates) granting to it authority to transport in tank trucks for hire petroleum products from Kansas refining points to many points, including Kearney and Lowell, in Nebraska. Several of those destination points, but not Kearney or Lowell, were also included within the authorization of the defendant's permit. Grantham was engaged principally in the petroleum products business at Kearney, and, now under the sole ownership of Charles E. Grantham, still is so engaged.

Eventually, and before July 1, 1947, Grantham discontinued all of its operations as a carrier of petroleum products and sold its equipment to others, one unit thereof being sold to the defendant. One of the customers served by Grantham in and during its transportation business was G. W. Ruby Oil Company, of Lowell (hereinafter referred to as Ruby). In anticipation of Grantham's withdrawal from the transportation field, negotiations for the carriage of petroleum products for Ruby were had between the defendant and Ruby. Similar negotiations were had at a not precisely established time between the defendant and one A. C. Lund, then of

Kearney, now deceased, for the carriage of petroleum products for an oil and gasoline business of the latter at Kearney. Lund had not theretofore been a customer of Grantham. The managing partner of Grantham was aware of such negotiations of the defendant with Ruby and Lund.

The defendant's operating authority did not allow him to serve Lund and Ruby. Grantham's permit No. MC.850 was broad enough to cover that service. Contingent on the approval of the Interstate Commerce Commission, arrangement was made between Grantham and the defendant for the asssignment to the defendant of the holder's rights under permit or certificate No. MC.850, and early in March, 1947 an application bearing date February 13, 1947 was made to the Commission for such approval. On June 4, 1947, the Commission entered an order denying the application on the ground that as to sundry destination points within MC.850 the transfer would result in the vesting of dual authority in the defendant. On September 4, 1947 it denied a petition for the reconsideration of that ruling.

In the meantime, and on July 1, 1947, Grantham and the defendant entered into a so-called equipment lease agreement in writing, covering a designated motor truck and standard steel trailer belonging to the defendant. By it the defendant, as lessor, ostensibly leased the truck and trailer to Grantham, as lessee, on conditions and for a rental reflected in the instrument, whose essential terms are fully set out in a footnote.[1] Before making the agreement the defendant talked with one Benton, an employee of the Commission resident at Lincoln, from whom, or, in any event after talking with whom, he procured a form or forms of agreement which had theretofore supposedly been used by some parties wholly unidentified in the record before the court in the leasing of equipment for hauling within the economic area of the Commission's jurisdiction. But Benton

---

1. "Witnesseth, that the said Lessor has this day rented to the said Lessee on the basis of part time use, the following described equipment

"I 1947 L.J.T. Mack motor No.EY 707-165-55
1944 Standard Steel Trailer 5355 gal Serial No. 446269

"II In consideration for the use of said equipment, the Lessee agrees to pay rent to the Lessor in accordance with the terms and conditions as hereinafter set out.

"(a) The rental for the leased equipment described above is to be computed on the basis of the gross earnings made by the said vehicles during the time it is being used for and on behalf of the said Lessee.

"(b) From the gross earnings, the Lessee shall first deduct 3% percent which he shall retain for himself.

"(c) The amount remaining shall be paid to the Lessor by the Lessee as rental for the use of said vehicles.

"(d) It is further understood and agreed by and between the parties hereto that the Lessor is to pay all the operating costs of said vehicles while used for and on behalf of said Lessee, said costs to include the drivers wages, social security taxes, unemployment compensation, compensation insurance premiums and all other insurance premiums and or taxes required by law.

"(e) It is further agreed by and between the parties that the Lessee shall be relieved of all liability for the loss or damage to the property herein above set forth, occasioned by the reason of fire, windstorm, theft, hail, flood, rising water, invasion, insurrection, strikes, lockouts, riots, civil war or commotion, military or usurpt power, or collision; all such liability to be assumed by the Lessor.

"III The parties hereto understand and agree that this lease is on a part-time basis only, and the provisions of this instrument apply only when said equipment is being used on or for behalf of the Lessee. The Lessor has the privilege of using the said equipment for his own desires at any time without giving the Lessee notice of any kind.

"IV It is fully understood and agreed that during the time of use of said equipment for and on behalf of Lessee, the same shall be entirely and exclusively under the control of the Lessee.

"V The duration of this agreement shall be from the 1 day of July, 1947 to the 1 day of July, 1948, on a partime basis as above provided, unless sooner terminated by either of the parties by giving of written notice to the other not less than ten days 10 days prior to the date of termination for any reason which to them may be deemed sufficient."

had merely cautioned the defendant that any lease of equipment must be in writing, mentioned instances or examples in which leases had been employed, and, possibly, though not certainly, provided the specimen or specimens of such leases. He did not define with any precision the necessary terms of a lease or the details of actual operation thereunder.

Operation within the contemplation of the parties to the agreement proceeded at once, first, in service beginning July 2, 1947 to Ruby and thereafter in service beginning January 17, 1948 to Lund. They included, along with many others, the twenty items of transportation charged in the several counts of the information. Without detailed repetition the factual transportation reflected in each count is admitted, and formally found, to have occurred.[2] The circumstances of the movements and the method of operation were essentially the same in reference to each shipment.

For each cargo, the transportation charge was billed by the defendant but in the name of Grantham and collection was made by the defendant, usually, if not invariably, in the form of the customer's bank check made payable to Grantham but, with Grantham's general knowledge and approval, endorsed in the name of Grantham by the defendant, or one or another of his employees. The proceeds of such payments were collected and retained by the defendant. After the operation had continued for a measurable period of time and prompted by the admonitions of a representative of the Commission, the defendant (a) caused to be placed on the equipment in question a statement that it was operated by the defendant but leased to Grantham, in which reference was made to permit No. MC.850, and (b) procured at his expense insurance in the name of Grantham to cover the operation.

But in all other respects the transportation was by and in the name of the defendant. The equipment was operated throughout all challenged movements by employees of the defendant, paid by him in the management of his regular payroll. It clearly appears that Grantham paid no drivers' wages, made no federal payroll deductions, and had no control over the drivers or the movements. Drivers' logs were returned to and maintained by the defendant. The defendant paid the transportation taxes on shipments, did all of the bookkeeping incident to the carriage, collected the charges therefor, and paid the cost and expenses thereof. Registrations and reports at state ports of entry were made in the name and behalf of the defendant as "owner or operator". Notification of the availability of loads for transportation was given by the customers not ordinarily to Grantham but generally to the defendant or his agents or employees, although on some occasions customers made contact with the defendant through Grantham. The shipping documents designated the defendant as the carrier. Inspection certificates designated his permit by number as the authority for carriage. The defendant's Nebraska transport permit was utilized for the purpose.

During the period involved, and continuously after the sale of its motor and tank trailer equipment, Grantham remained completely out of the petroleum carriage enterprise. And eventually, though it is not shown when, it sold its interests under permit No. MC.850 to a party other than the defendant. At about that time operations under the ostensible lease of equipment were terminated.

In his bookkeeping records, during the entire period of the operation under examination, the defendant kept a ledger account entitled "H. V. Grantham Lease". In it in chronological sequence he made notations in connection with each cargo carried disclosing its date, the customer, its serial number, the charge to the customer for transportation, and a credit of three percent of the collected charge. And into a final column he carried a progressive summation of the three percent credits, so that in connection with each item of

---

2. Counsel may understand that the court, without unnecessary enumeration adopts as fact found the matters agreed upon in their written stipulation or naturally and necessarily following from the records incorporated therein.

transportation the entry in that final column was the aggregate amount of the three percent credits on account of the previous haulings including the one reflected on that line. From July 2, 1947 to March 12, 1949, the sum of such credits arising out of a total of 118 cargo movements was $428.62. But while that sum was punctually credited to the "H. V. Grantham Lease" account, and presumably thereby to Grantham, it was not, and has not yet been, paid to Grantham or to any one else. Grantham and the defendant had other business transactions involving mutual financial charges between them, out of which controversy arose; and they are now engaged in litigation in a Nebraska state court in which the position of their obligations each to the other, from many sources including the one now under consideration, is involved. The mere failure of the defendant actually to pay the contracted percentage charge to Grantham is not regarded in the circumstances as evidence of any intention on his part not eventually to pay or to account for it.

After the initiation of the operations and before the date of first transportation charged in the information, the defendant had a conversation with one Hudson, the Commission's district supervisor, upon the subject of the leasing of oil carrying equipment for operation by the lessee. That conference took place about October 12, 1948. In it Hudson advised the defendant that there was no objection to the leasing of equipment and the operation thereof by a duly licensed lessee, but emphasized that in such a transaction the lessee must be the real operator, do the billing, make all collections, maintain the required insurance and procure the delivery to him or it and retain the possession of drivers' logs, and generally perform all of the acts normally associated with the actual operation by carriers of oil transports. However, at that time Hudson had not seen, and did not then see, the lease between the defendant and Grantham. Nor did he say that the concrete operation then in progress was or was not violative of the law or order its discontinuance. His comment

did not proceed beyond the general advice that in leased equipment operation, the lessee must be the real operator, except that he insisted that insurance covering the operation be provided at once in the name of Grantham as operator, and that a sign or legend be affixed to the leased equipment identifying Grantham as the lessee-operator.

There were not during the interval embracing the challenged operations, and are not now, any formal published regulations made by the Commission governing the operation of leased equipment by interstate carriers of the character here involved, or declaring the Commission's minimum requirements in connection therewith.

On December 15, 1942 in the McCook division of this court, the defendant on his plea of guilty was found and adjudged to be guilty of, and was sentenced upon, a charge of the violation, in connection with operations as an interstate carrier of the Interstate Commerce Act, as charged in an information in ten counts, theretofore filed in that division of the court. None of the counts of that information arose out of the defendant's alleged operation with leased equipment, or in that respect, was similar to the charge now made.

Upon the facts found, the court is convinced beyond a reasonable doubt that the defendant is guilty as charged upon each count of the information. The lease of July 1, 1947 appraised in the light of the practical conduct of the parties is completely unrealistic and a mask or sham not reflecting, but rather concealing the actual operations of the defendant.

The earlier effort, neither completely abandoned nor finally rejected on July 1, 1947, to acquire Grantham's operating rights discloses the true purpose of the parties. Grantham had abandoned the transportation business and desired wholly to part for value with its Interstate Commerce Commission permit. The defendant wanted to acquire it. Thwarted in that effort, but still litigating the question, the parties made the lease, whereunder Grantham's permit was to be utilized for the operations to Kearney and Lowell as

destination points which the defendant had in view.

Without asserting or thinking that operations conducted within the definition and ostensible plan of the written lease would have been unlawful, the court finds that such operations never occurred. The lease contemplated and provided for transportation by Grantham. What resulted was transportation, with virtually all of its identifying indicia, by the defendant. Grantham was, and remained, out of the transportation business. The defendant simply extended his carriage operations to the forbidden destinations of Kearney and Lowell. Branding the equipment with a legend declaring its leasing to Grantham and procuring insurance coverage in Grantham's name, both under the spur of the Commission's representative are inadequate to nullify that conclusion. After, as well as before, those actions the substantial operation in complete reality was the defendant's. Nor are the bookkeeping operations already mentioned effective to convert the defendant's carriage into an operation by Grantham.

The indispensable ingredient of good faith which must characterize operations under a lease of this nature has been made clear by many judicial decisions which have invariably emphasized the controlling effect of the actual operations of the parties involved, upon the important question of the identification of the real operator. Among them may be mentioned Bridge Auto Renting Corp. v. Pedrick, 2 Cir., 174 F.2d 733; Georgia Truck System v. I. C. C., 5 Cir., 123 F.2d 210; I. C. C. v. Pickard, D.C.N.Y., 42 F.Supp. 351; Isner v. I. C. C., D.C.Mich., 90 F.Supp. 361; I. C. C. v. Isner, D.C.Mich., 92 F. Supp. 582; United States v. Steffke, D.C. Minn., 36 F.Supp. 257; I. C. C. v. F. & F. Truck Leasing Co., D.C.Minn., 78 F. Supp. 13; and the recent case of United States v. La Tuff Transfer Service, D.C. Minn., 95 F.Supp. 375.

The court is fully aware that to a conviction under the statute, Title 49 U.S. C.A. § 322(a),[3] it is necessary that the violation be found beyond a reasonable doubt to have been both knowing and willful. But both of those qualities certainly characterized the defendant's acts of transportation. He knew the necessity of the holding by the actual carrier of a valid permit for the transportation he had in view. If anything beyond his engagement in the business for many years were needed to establish such knowledge, it would be found, first, in his effort to acquire with competent approval Grantham's permit, and, secondly, in his making of the equipment lease. His familiarity with the transportation field negatives the reasonable possibility of his supposition that his acts incident to the several cargo movements mentioned in the information fell in some degree short of transportation by him. Finally, the lease itself as a backdrop for the acts performed ostensibly in furtherance, but really in disregard, of it discloses a knowing and willful effort by the defendant to operate within the area of the statute but through an artifice designed to evade its consequences. See United States v. Illinois Cent. R. Co., 303 U.S. 239, 243, 58 S.Ct. 533, 82 L.Ed. 773. His patent obstinacy in his resolution to accomplish the transportation available to him supports the conclusion that he acted knowingly and willfully.

The court, therefore, adjudges the defendant to be guilty as charged in each of the twenty counts of the information.

Although mindful of its finding of the defendant's previous conviction under Title 49 U.S.C.A. § 322(a), the court sentences the defendant to pay a fine of $25 upon each of the twenty counts of the information ($500 in the aggregate) and to pay the costs of the prosecution. It is fully

3. "* * * Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not other-wise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

recognized that in view of the status of the violation in each count as a "subsequent offense", the fine might be as much as $500 on each count. However, despite the earlier conviction, the circumstances of the instant offense do not lead the court to, or near, the harshness thus allowed. Guilt is unquestionably and inexcusably present, but under conditions which argue for the measure of indulgence reflected in this announcement.

A judgment is being entered accordingly.