In re Application of Jeffries-Eaves, Inc.
Jeffries-Eaves, Inc., et al., appellants, v. W. F. Gettel,
Inc., et al., appellees.
113 N. W. 2d 476

Filed February 16, 1962.   No. 35060.

*Nelson, Harding & Acklie* and *Donald E. Leonard,* for appellants.

*Torgeson, Hurlbut & Knapp* and *Robert S. Stauffer,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This is an appeal from an order of the Nebraska State Railway Commission dated March 29, 1961, by which it sustained a motion by W. F. Gettel, Inc., appellee, for rehearing and reconsideration of its order of January 11, 1961, which had authorized the transfer of a certificate of public convenience and necessity of Oilfield Trucking, Inc., to Jeffries-Eaves, Inc., both of whom are appellants. The order appealed from granted the rehearing and reconsideration, and denied the application to transfer.

Hereafter, the Nebraska State Railway Commission will be designated as the commission; Oilfield Trucking, Inc., as Oilfield; Jeffries-Eaves, Inc., as Jeffries; and W. F. Gettel, Inc., as the protestant or Gettel.

The application of Oilfield and Jeffries which was to effectuate the transfer of certificate of public convenience and necessity No. M-10631, from Oilfield to Jeffries was filed with the commission on February 23, 1960, and was docketed as application No. M-11145.

Attached thereto was an agreement between the par-

ties showing the consideration of the proposed transfer and sale of the authority as $15,000, which Jeffries had placed in escrow in a bank to be delivered to Oilfield on final approval of the commission or, if appealed, by a court of last resort. Articles of incorporation of Jeffries and documents showing its equipment, financial condition, and other matters were likewise appended.

Application No. M-11145 was regularly set for hearing at Sidney, Nebraska, on April 13, 1960. Prior to the hearing Gettel and another carrier filed formal protests. One protest set out that Oilfield had conducted no operations for the past several years under its certificate and further it was in violation of the rules and regulations of the commission relative to providing reasonable and adequate service to the public.

The commission entered an order directed to Oilfield requiring it to show cause why its certificate of public convenience and necessity No. M-10631 should not be revoked for willful failure to comply with the provisions of the Nebraska Motor Carrier Act and the rules and regulations of the commission thereunder. The hearing on the order to show cause was likewise set for April 13, 1961, at Sidney, Nebraska.

A hearing was had before the examiner on that day and evidence was taken for the applicants and the protestants which will be discussed later.

During the examination of the witness Porter, president of Oilfield, the attorney for the protestant requested the production of the records of Oilfield with respect to certain financial transactions between Oilfield and Jeffries with reference to leased equipment. The witness testified they were in Winfield, Kansas, and the applicants' attorney stated, on request being renewed for their production, that Oilfield would not produce them and if protestant wanted them it would have to subpoena them.

On May 2, 1960, the protestant filed a praecipe for a subpoena duces tecum for Porter, president of Oilfield

and the proposed transferor, and Boyd, vice-president of Jeffries, the transferee, who testified at the hearing on April 13, 1960. It sought to require them to appear before the commission at a time and place to be set and to bring the financial records of the two companies with respect to lease arrangements and payments between them. It also asked for the records of payments made by them to others for services and the amounts paid or withheld for federal social security or income taxes. Likewise, it sought the records concerning the owners and drivers of equipment; whether Jeffries or Oilfield accepted, loaded, or delivered the freight; and concerning which of them collected the freight charges for transportation. It also sought the written lease between Jeffries and the owners of equipment that had been in turn leased by Jeffries to Oilfield.

Objections were filed on May 2, 1960, by both Oilfield and Jeffries to the granting of the subpoena and a motion made to quash the same. The motion to quash was overruled on May 3, 1960, and the praecipe granted. It provided that the matter should be thereafter set for further hearing.

On July 14, 1960, separate subpoenas were issued for each witness to appear with the records before the examiner on August 10, 1960, at Sidney, Nebraska. The subpoenas were served by sending them by registered mail, addressed to the witnesses without the State of Nebraska.

Jeffries, on July 18, 1960, filed a motion for rehearing and reconsideration of the order granting the subpoena but it was overruled by the commission. By a motion filed by both applicants and protestant the hearing was continued and thereafter was set for October 12, 1960, at the courthouse at Sidney, Nebraska, when further evidence was taken.

The transcript of the testimony taken at the hearing on April 13, 1960, was filed with the commission on

May 5, 1960, and that of the hearing on October 12, 1960, was filed on November 2, 1960.

On December 28, 1960, the examiner filed his report which reviewed the record and evidence, and at the conclusion recommended the application to transfer be granted.

On January 11, 1961, the commission entered an order granting the transfer from Oilfield to Jeffries on application No. M-11145, and granted Jeffries a certificate of public convenience and necessity for transporting oilfield equipment, materials, and supplies, as provided in the certificate previously held by Oilfield between points and places in Nebraska over irregular routes.

The order contained the following findings required by section 75-240.02, R. R. S. 1943:

"3. The proposed Transfer will be consistent with the public interest and will not unduly restrict competition.

"4. Applicant is fit, willing and able properly to perform the service proposed.

"5. It does not appear the certificate involved is dormant, nor that approval of the transfer will result in a new or different service or operation as to territorial scope than that which is or may be rendered or engaged in by the transferor."

Thereafter, on January 19, 1961, the protestant Gettel filed a motion for rehearing and reconsideration which was argued before the commission. Thereafter, on March 29, 1961, the commission entered an order in effect reversing its order of January 11, 1961, and sustaining the motion for rehearing and reconsideration of application No. M-11145. It vacated and set aside the order of January 11, 1961, and denied the application. Its findings in the order of March 29, 1961, insofar as necessary for this opinion, were as follows:

"3. That the proposed transfer of the certificate in Application No. M-10631 of Oilfield Trucking, Inc., Winfield, Kansas, to Jeffries-Eaves, Inc., Albuquerque, New

Mexico in Application No. M-11145 would result in a new or different service or operation as to territorial scope than that which is or may be rendered or engaged in by the transferor.

"4. That applicant, Jeffries-Eaves, Inc., Albuquerque, New Mexico, has failed to prove that the proposed transfer is or will be required by the present and future public convenience and necessity in the same manner as provided in Section 75-230, R. R. S. 1943."

From this order of March 29, 1961, sustaining the motion for rehearing and denying application No. M-11145, the applicants Oilfield and Jeffries have appealed to this court.

The applicants' assignments of error, insofar as they are discussed and argued in their briefs and which are required to be considered by this court, are as follows:

1. Error in the exercise of power by the commission without proper compliance with the law in its opinion, findings, and order entered March 29, 1961.

2. The commission erred in finding that the proposed transfer would result in a new or different service or operation as to territorial scope than that which is or may be rendered by Oilfield Trucking, Inc.

3. The commission erred in finding that the applicants were required by statute to show that the proposed transfer is or will be required by the present and future public convenience and necessity.

4. The order of the commission dated March 29, 1961, denying application No. M-11145, is unreasonable, arbitrary, and contrary to law as being contrary to the evidence and law.

The applicants Oilfield and Jeffries complain first of the findings and order of the commission of March 29, 1961, as being erroneous and arbitrary. Their argument is confined to the contention that the findings of the commission contained in its order of January 11, 1961, were still in full force and effect because not specifically revoked or cancelled by the commission. They

maintain that by virtue of sections 75-415 and 75-416, R. R. S. 1943, these findings remain in force until specifically annulled and that the vacation and revocation of the order leaves the findings still operative. They further contend that the original findings were sufficient to authorize the transfer of the authority of Oilfield, under certificate No. M-10631, to Jeffries and that the new findings were inconsistent with the old ones.

We cannot accede to this argument. Section 75-406, R. R. S. 1943, provides that a motion for rehearing may be filed within 10 days after the mailing of a copy of the commission's order which was filed in this case. Section 75-415, R. R. S. 1943, provides that no order shall go into effect during this 10-day period. It is apparent that rehearings are to be had in the proper case and this court has so held. Miller v. Consolidated Motor Freight, Inc., 168 Neb. 712, 97 N. W. 2d 265.

When the Nebraska State Railway Commission holds a rehearing and at the rehearing vacates and sets aside a former order the findings in the prior order are of no further effect.

It is also urged by the applicants that the order of March 29, 1961, was improper and invalid because the commission took no further evidence before the order was entered. The requirement that new evidence be taken hinges entirely upon whether or not it had before it sufficient evidence upon which it might on reconsideration make a new and different order. This has been done by the commission with approval of this court in Miller v. Consolidated Motor Freight, Inc., *supra*.

The next three assignments of error, in view of the determination we make of the case before us, depend upon a review of the evidence as shown by the bill of exceptions.

Before entering on a discussion of this evidence, it is appropriate to summarize the rules of law applicable to proceedings of this nature.

In the case of Neuswanger v. Houk, 170 Neb. 670, 104 N. W. 2d 235, this court laid down the following rules:

The question of dormancy, in case where an application is made for transfer of operating rights, should be the same as where an order to show cause had been issued based upon that ground.

Where a certificate of public convenience and necessity is not dormant it may be transferred on approval of the Nebraska State Railway Commission under reasonable rules and regulations to be prescribed by it, (1) if the transfer will be consistent with public interest, (2) if it will not unduly restrict competition, and (3) if the transferee is fit, willing, and able to perform the service proposed.

In determining the issue of public convenience and necessity, in cases where new or extended operating rights are sought, controlling questions are whether the operation will serve a useful purpose responsive to a public demand or need; whether this purpose can or will be served as well by existing carriers; and whether it can be served by applicant in a specified operation without endangering or impairing the operations of existing carriers contrary to the public interest.

Where an application is made for the transfer of operating rights under the provisions of section 75-240, R. R. S. 1943, the question of whether or not such operating rights are dormant, within the meaning of the foregoing statute, relates to the time the application is made, a hearing is held thereon, and for a reasonable length of time immediately prior thereto.

On an appeal to the Supreme Court from an order of the Nebraska State Railway Commission administrative or legislative in nature, the only questions to be determined are whether the commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made.

With these rules in mind we will now proceed to dis-

cuss the evidence as shown in the record before us. It is voluminous and there is some conflict in it but the greater portion of the controversy between the parties arises from diverse inferences and conclusions that can be drawn from it.

The transferor Oilfield had statewide authority to operate as a motor carrier in intrastate commerce in Nebraska authorizing it to carry oilfield equipment and supplies over irregular routes. Jeffries had interstate authority to carry the same type of equipment to and from Nebraska. It had no intrastate authority in Nebraska and desired to acquire it.

At the hearing on April 13, 1960, the only witnesses for the applicants were Porter, the president and general manager of Oilfield, who resided at Winfield, Kansas, where its administrative offices were located, and Olif Boyd, vice president of Jeffries, a resident of Denver, Colorado. Porter testified that Oilfield carried on business in Nebraska in a separate division. It had operated with leased equipment from facilities at Sidney, Nebraska, since January 10, 1960, on which day it leased equipment from Jeffries. The leased equipment consisted of 12 power units. The trailers were included with this leased equipment. Each tractor with trailer was of the approximate value of $27,000. The lease provided that Oilfield pay $50 a month per unit to Jeffries. The terminal facilities at Sidney were handled by a manager who was paid $500 a month by Oilfield. His name was Skeets Hardy. He was an employee of the transferee Jeffries who paid him $500 a month. He was also one of the owners of Reliable Trucking Company, a company having similar equipment. It will hereinafter be referred to as Reliable. Oilfield, Jeffries, and Reliable used the same facilities at Sidney. Hardy attended to the business of all of them. Jeffries did not own the equipment leased to Oilfield. Of the equipment three units were leased by Reliable to Jeffries. The other nine units were leased from other parties to

Jeffries. These units, 12 in all, were subleased to Oilfield. The only facilities Oilfield had at Sidney were the ones furnished by Hardy. Oilfield made no arrangements with respect to their acquisition.

The witness Porter did not know what improvements were on the facilities and whose facilities they were. He did not know whether Oilfield had advertised in Nebraska for 6 months prior to the hearing. The witness on cross-examination did not know whether the rental of $50 a month per unit had been paid because the records were at Winfield. He did not know who actually owned the equipment or how it was marked.

The testimony disclosed remittances for Nebraska transportation were sent to both Oilfield at Winfield and Jeffries at Albuquerque, which was Jeffries' home office. The leased equipment at Sidney was used interchangeably in both interstate and intrastate operations. It was leased to Jeffries by certain individuals, subleased to Oilfield, and trip leased back to Jeffries for interstate work. The trip leasing was verbal by Hardy and not embodied in the sublease to Oilfield. Jeffries operates in 14 states and Canada in interstate commerce, including Nebraska, and 5 other states in intrastate commerce.

The witness Boyd had no knowledge of the remittances going to Jeffries at Albuquerque. He knew none had been cashed by Jeffries. Jeffries had access to the accounts receivable at Sidney. When the Reliable equipment was used in interstate commerce by Jeffries, Reliable received 89½ percent of the revenue. Boyd stated Jeffries was developing the business and would receive the benefit if the application was approved. He stated no payment except the lease fee was paid by Oilfield to Jeffries. Boyd states at first that there was no procedure set up by Jeffries for accounting with Oilfield. The intrastate revenue went to Oilfield. Oilfield paid the individual owners of equipment used in intrastate commerce in addition to the $50 to Jeffries. The original

owners of equipment received 89½ percent of gross intrastate revenue. Later he stated Jeffries paid the owners and Oilfield paid Jeffries. Jeffries had three employees in addition to Hardy at Sidney. They were not paid by Oilfield.

Prior to the sublease of equipment from Jeffries, Oilfield had no terminal at Sidney. It had leased equipment from Bill Kope, hereinafter referred to as Kope, who had a small yard at Kimball, Nebraska. These operations were testified to by Porter. Oilfield received 5 percent of the gross revenue from Kope's operating this equipment. Kope had authority to receive the bills and pay them with checks drawn by him on a Kimball bank. Kope received the receipts and deposited them at that bank. Oilfield had no control over the account and put no money into the operation. Kope received no salary and Oilfield did not hire or supervise the personnel. Kope never made an accounting. When asked if the losses of Oilfield exceeded the 5 percent gross, the president answered that they made nothing out of the arrangement.

At the hearing on April 13, 1960, abstracts of shipments were prepared and introduced in evidence. The first of these, exhibit 2-A, was submitted as shipments of Oilfield from August 5 to December 15, 1959, and contained records of 211 shipments. This was the period during which Kope operated the terminal at Kimball. It ended at about the time he ceased acting for Oilfield.

The second, exhibit 3, contained the shipments from January 18 to March 29, 1960, when Hardy operated the facilities at Sidney which contained a record of about 90 shipments. No shipments were shown between the time of leasing of equipment from Kope and the lease from Jeffries. There was testimony tending to show one unit of equipment for operation in Nebraska stationed at Great Bend, Kansas, but no record was produced of any operations by it.

At the hearing the president of the protestant Gettel

testified as to its operation. It had statewide authority for carrying oilfield equipment in intrastate commerce in Nebraska. Gettel had 10 truck-tractors of which 9 were rigged for oilfield work, and 14 trailers with a terminal at Kimball, Nebraska, covering between 10 and 15 acres. It has two telephones and a radio system between the office and equipment. It maintained offices at Sidney with a telephone, also a yard covering 5 acres . at Harrisburg, Nebraska. An accountant testified as to the balance sheet and operating statement for 1959. It showed an invested capital approximating $265,000 for common carrier equipment and gross revenue for the year of $317,257.57. Its net income however was only $3,790.97.

Gettel, the president, testified that Jeffries had offered to buy the authority with an agreement to transfer it back if the arrangement at any time proved to be unsatisfactory.

Ernie Neff, president of Neff Trucking Company, a protestant, testified as to its facilities at Kimball and elsewhere. The facilities at Kimball alone represented a thirty thousand dollar investment. It had $268,000 invested in motor equipment at Kimball. It hired 75 employees of whom 35 were in Nebraska.

The testimony of the protestants was of course for the purpose of showing adequate facilities existed for the oilfield business and that further authority to be granted would injure those not operating very profitably at the time.

In the October hearing following the issuance of the subpoena duces tecum further evidence of substance was offered and received both in the form of documents and testimony.

A new motion was made at the hearing to release Porter from the subpoena on the grounds that he was served while in Kansas and that Oilfield's records had been produced in any event in response to the subpoena.

He was released but the examiner ordered the records of Oilfield to be submitted to counsel.

Donovan M. Hoover, vice president and general counsel of Jeffries, and Olif Boyd, another vice president, who had testified previously, were called by the protestant and testified. Hoover testified that all of the records of Oilfield pursuant to the subpoena were produced. The lease of equipment from Jeffries to Oilfield was introduced in evidence. The lease, dated January 10, 1960, covered 9 units of equipment. It was stamped "approved conditionally," by the Motor Transportation Department of the Commission. The lease provided the rental to be paid to Jeffries was $50 a month per unit. The drivers were to be exclusively the employees of the lessee Oilfield. Jeffries owned none of this equipment. A lease of one of the owners to Jeffries was introduced and the testimony was that the remaining original nine units described in the lease given by Jeffries to Oilfield were similar to it except for the names of the lessors and description of the units. They purport to be leases to Jeffries for use in interstate commerce and provide for the exclusive control in Jeffries of the leased equipment. By their terms the equipment was to be operated only by licensed drivers in the lessee's employment. Rental in an amount equal to 89½ percent of the gross revenue earned by each unit was to be paid with the exception of three units which were rented from Reliable which was to receive 90 percent. None of the leases provided for subleasing.

Later, three units were added to the equipment. They likewise had been leased to Jeffries and were reported to the commission as added to the subleased equipment to Oilfield and the commission approved on a copy of the letter.

Records from the books of Jeffries and testimony explaining them show the receipts from both interstate and intrastate shipments at Sidney were sent to and received by Jeffries. Prior to April 13, 1960, the re-

mittances for intrastate shipments were sent to Oilfield at Winfield, Kansas, and endorsed and sent to Jeffries at Albuquerque, New Mexico. Subsequent to that date they went directly to Jeffries at Albuquerque. These later remittances were endorsed by Billy Saxon whom the witness said was an agent for Oilfield appointed for convenience. The receipts for interstate and intrastate shipments however were identified separately on Jeffries' books. Thereafter, approximately 89½ percent of the revenue less certain small charges from both operations were remitted by Jeffries' check to Reliable at Sidney. Hoover testified that Reliable was the agent both of Jeffries and Oilfield, but there was no further showing as to what happened to these payments. Hoover said it was beyond his information as to whether there were any such records. It appears that Reliable was the owner of part of the equipment and the assignee of owners for collection of the rent from the others, and that this might be in payment of the rentals.

The remaining 10 percent, or thereabouts, was kept by Jeffries. Hoover testified it was retained by Jeffries under an agreement of the parties "based upon bookkeeping services rendered by Jeffries-Eaves for Oilfield Trucking, Inc."

The records of Jeffries with respect to the employees assigned to the Sidney terminal, including wages paid for transportation in both interstate and intrastate commerce, were identical as to type of information. Twenty persons were employed during the period of the operations under the equipment lease. From each Jeffrey deducted F.I.C.A. and withholding taxes, and from the records were prepared the necessary government reports. Boyd testified that the only way to show from the records who loaded and unloaded shipments in exhibit 3, being the shipments claimed as Oilfield, was to examine the several bills of lading, and time and trip sheets which were not brought pursuant to subpoena because the witness thought they would not be asked

for. All of the office help at the Sidney terminal were employed by Jeffries except one girl, an employee of Reliable.

No records were shown concerning the payment by Oilfield of $500 a month to Hardy as salary nor the rental of the 12 units of equipment at $50 a month per unit to Jeffries. It would seem that if 89½ percent of gross income was remitted to Reliable and 10 percent retained for bookkeeping service, no operational funds would be available to pay them. If paid, Oilfield's operation would have been at a substantial loss.

Neither Hardy nor Kope, the agents of Oilfield at Sidney and Kimball, testified.

There was, of course, other evidence. The review would however appear to reflect the substance of the whole. It would appear with such evidence before it there was reasonable grounds for the commission to find on rehearing and reconsideration that the operation, instead of being that of Oilfield operated by it under its authority through leased equipment, was in fact an operation of the authority of Oilfield by the proposed transferee Jeffries to reactivate that which was to all intents dormant. The character of the operation when Kope leased equipment immediately before the Jeffries lease appears substantially the same.

Under a quite similar factual situation the United States District Court for the District of Nebraska, in United States v. Canada, 105 F. Supp. 126, a criminal case for illegal operation without authority, stated: "Upon the facts found, the court is convinced beyond a reasonable doubt that the defendant is guilty as charged upon each count of the information. The lease of July 1, 1947 appraised in the light of the practical conduct of the parties is completely unrealistic and a mask or sham not reflecting, but rather concealing the actual operations of the defendant.

"The earlier effort, neither completely abandoned nor finally rejected on July 1, 1947, to acquire Grantham's

operating rights discloses the true purpose of the parties. Grantham had abandoned the transportation business and desired wholly to part for value with its Interstate Commerce Commission permit. The defendant wanted to acquire it. Thwarted in that effort, but still litigating the question, the parties made the lease, whereunder Grantham's permit was to be utilized for the operations to Kearney and Lowell as destination points which the defendant had in view.

"Without asserting or thinking that operations conducted within the definition and ostensible plan of the written lease would have been unlawful, the court finds that such operations never occurred. The lease contemplated and provided for transportation by Grantham. What resulted was transportation, with virtually all of its identifying indicia, by the defendant. Grantham was, and remained, out of the transportation business. The defendant simply extended his carriage operations to the forbidden destinations of Kearney and Lowell. Branding the equipment with a legend declaring its leasing to Grantham and procuring insurance coverage in Grantham's name, both under the spur of the Commission's representative, are inadequate to nullify that conclusion. After, as well as before, those actions the substantial operation in complete reality was the defendant's. Nor are the bookkeeping operations already mentioned effective to convert the defendant's carriage into an operation by Grantham."

The present case under consideration is not before us de novo. It is here as far as the evidence is concerned to ascertain whether the action of the commission was arbitrary or unreasonable.

The appellant Jeffries had no certificate of public convenience and necessity to operate a motor carrier in Nebraska in intrastate commerce. In R. B. "Dick" Wilson, Inc. v. Hargleroad, 165 Neb. 468, 86 N. W. 2d 177, this court quoted section 75-228, R. R. S. 1943: " 'It shall be unlawful for any common carrier by motor

vehicle subject to the provisions of sections 75-222 to 75-250, to engage in any intrastate operations on any public highway in Nebraska unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the State Railway Commission authorizing such operations.' "

The question of whether the operating authority of Oilfield was being operated lawfully by it by means of leased equipment or whether it was dormant and was being unlawfully operated by Jeffries at the time the requested transfer was before the commission. It would appear there was evidence before it from which it might reasonably be inferred that Oilfield had discontinued its own operations.

Where on application to transfer a certificate of public convenience and necessity the dormancy of the certificate may reasonably be inferred from the evidence before the commission, the express provisions of section 75-240.02, R. R. S. 1943, provide that the commission may approve an application for transfer only upon the basis of proof of, and a finding that, the transfer of such certificate is or will be required by the present and future public convenience and necessity in the same manner as provided in section 75-230, R. R. S. 1943.

In such a case this court has held the burden is on the applicant for the certificate to show that the statutory requirements for the issuance thereof exist. In re Application of Moritz, 153 Neb. 206, 43 N. W. 2d 603.

It would follow that if the operational authority were dormant the proposed transfer would also result in new or different service or operation as to territorial scope. In the present case the protestants introduced considerable evidence from which the commission could find that adequate facilities already existed for the transportation of oilfield equipment and that public convenience and necessity did not require further service by carriers in the field requested.

We cannot find that the order of the commission was

arbitrary or unreasonable, and its action should be affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.